SEALED MATTER AUSA: Amy Markopoulos  Telephone: (313) 226-9642
Special Agent : Justin Bidwell  Telephone: (313) 392-8019

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Michigan

23

United States of America,

              Plaintiff,

    v.                                    Case: **2:15−mj−30287**
                                          Assigned To : **Unassigned**
Rizwan Qadir                              Assign. Date : **6/17/2015**
                                          Description: **RE: SEALED MATTER (EOB)**

              Defendant(s).

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

On or about the date(s) of <u>January 2010 to present</u>, in the county of <u>Macomb</u> in the <u>Eastern</u> District of <u>Michigan</u>, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1347 | Health Care Fraud |
| 18 U.S.C. § 1349 | Conspiracy to Commit Health Care Fraud |
| 18 U.S.C. § 371 | Conspiracy to Pay and Receive Kickbacks |
| 42 U.S.C. § 1320a-7b | Offering, Paying, Soliciting, and Receiving Health Care Kickbacks |

This criminal complaint is based on these facts:
See Attached Affidavit.

☑ Continued on the attached sheet.

FILED
JUN 17 2015
CLERK'S OFFICE
U.S. DISTRICT COURT

_____
Complainant's signature

JUSTIN BIDWELL, SPECIAL AGENT
Printed name and title

Sworn to before me and signed in my presence.

Date: _____6/17/15_____

_____
Judge's signature

City and state: Detroit, Michigan

Hon. David R. Grand, U.S. Magistrate Judge
Printed name and title

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

The undersigned, Justin Bidwell, being first duly sworn, hereby deposes and states as follows:

### I.      AFFIANT'S BACKGROUND AND QUALIFICATIONS

1.      I, Justin Bidwell, hereinafter referred to as the Affiant, am a Special Agent employed by the United States Department of Health and Human Services (HHS), Office of Inspector General (OIG), Office of Investigations (OI).  I have been so employed since July 2010.  I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510 (7), in that I am empowered by law to conduct investigations and to make arrests for federal felony offenses.

2.      As part of my duties, I am authorized to conduct investigations, audits, and inspections in connection with the administration and enforcement of laws, regulations, orders, contracts, and programs in which HHS is, or may be, a party of interest, and perform other duties on behalf of the Secretary of HHS.  As a Special Agent with HHS-OIG, I have received basic criminal investigator training as well as specialized training in the investigation of fraud and financial crimes.  I have gained experience in how to conduct such investigations through specialized

1

trainings, seminars, courses, and from my participation in previous HHS-OIG investigations. I was previously employed as an Assistant Prosecuting Attorney in both Wayne and Macomb Counties in the state of Michigan, totaling approximately eight years. I was also detailed to the United States Attorney's Office for the Eastern District of Michigan for three years as a Special Assistant United States Attorney. My primary responsibility during the last thirteen years has been the investigation and prosecution of felony crimes. My current responsibility is investigating health care fraud committed against the federally-funded health care programs commonly known as Medicare and Medicaid.

3.     I have knowledge of the facts set forth in this Affidavit as a result of my participation in the investigation, as well as, information provided to me by other law enforcement agents involved in this investigation and others. Information pertinent to this investigation was also provided by Cahaba Safeguard Administrators, LLC (CSA), a private entity which contracts with HHS to perform investigations and audits designed to protect the Medicare program from waste, fraud, and abuse. In May 2015, CSA was replaced by AdvanceMed as the zone program integrity contractor (ZPIC) for Michigan. The ZPIC is responsible for the protection of the Medicare Trust Fund through detecting fraud, waste, and abuse.

4.      Your Affiant is assigned to an investigation of RIZWAN QADIR, M.D. (QADIR) and JOHNNY YOUNAN (YOUNAN), involving the unlawful distribution of controlled substances, the payment and receipt of illegal kickbacks for Medicare beneficiaries, and health care fraud. Based upon information obtained by the DEA, FBI, HHS-OIG, and private insurance companies, and a review of Medicare billing records, there is probable cause to believe, and I do believe that, QADIR is (a) writing and has written prescriptions for controlled substances outside the course of legitimate medical practice in exchange for cash payments from YOUNAN and others, (b) billing Medicare and other insurances for services that were not medically necessary and/or were not provided, and (c) paying and providing unnecessary home health certifications to patient recruiters, including YOUNAN, for bringing in Medicare patients in exchange for billing for unnecessary services.

5.      Based upon the information set forth below, I have reason to believe and do believe that QADIR is engaged in violation of the following statutes: Title 18 U.S.C. § 1347, Health Care Fraud; Title 18 U.S.C. § 1349, Conspiracy to Commit Health Care Fraud; Title 42 U.S.C. § 1320a-7b(b), Health Care Kickbacks; and Title 18 U.S.C. § 371, Conspiracy to Pay or Receive Health Care Kickbacks.

3

6.     Since this Affidavit is being submitted for the limited purpose of supporting a criminal complaint, I have not included each and every fact known to me concerning this investigation.

## II.     THE MEDICARE PROGRAM

7.     The Medicare Program (Medicare) is a federally-funded health care program providing benefits to persons who are over the age of sixty-five or disabled and was established by Congress in 1965, as Title 18 of the Social Security Act and codified at Title 42, United States Code, Section 1395.   The Medicare program is administered through the Centers for Medicare and Medicaid Services (CMS), formerly the Health Care Financing Administration (HCFA). CMS is a division of the Department of Health and Human Services (DHHS) of the United States Government.

8.     Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

9.     Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D).   Medicare Part B helps pay the cost of physician services, laboratory services, durable medical equipment, and supplies, and other health services and supplies not paid by Part A.

4

10.     Part D of the Medicare program subsidizes the costs of prescription drugs for Medicare beneficiaries in the United States.  It was enacted as part of the Medicare Prescription Drug, Improvement and Modernization Act of 2003 and went into effect on January 1, 2006.  Part D benefits are administered by private insurance plans that are reimbursed by Medicare through CMS.

11.     Beneficiaries can obtain Part D benefits in two different ways: they can join a Prescription Drug Plan which covers only prescription drugs; or they can join a Medicare Advantage Plan that covers both prescription drugs and medical services.

12.     Typically, a Medicare beneficiary enrolled in a Medicare Part D plan would fill their prescription at a pharmacy utilizing their Medicare Part D plan coverage to pay for the prescription.  The pharmacy then submits the prescription claim for reimbursement to the beneficiary's Medicare Part D plan for payment under the beneficiary's Health Insurance Claim Number and/or Medicare Plan Identification Number.

## III.   <u>INVESTIGATIVE BACKGROUND</u>

13.     In 2014, DEA Detroit, the FBI, HHS-OIG, and Blue Cross Blue Shield of Michigan (BCBS) initiated an investigation into an alleged health care fraud scheme and related illegal pharmaceutical drug trafficking operation in

southeast Michigan. Your Affiant learned through witness interviews, confidential source (CS) information, surveillance operations, and other sources of information (SOI) that YOUNAN was bringing Medicare beneficiaries into QADIR's offices to get prescriptions for controlled substances that were outside the scope of legitimate medical practice. QADIR received cash payments from patient recruiters, including YOUNAN, in exchange for QADIR writing medically unnecessary prescriptions for controlled substances. QADIR also submitted claims to Medicare for services that were medically unnecessary and/or never provided for the Medicare beneficiaries that such patient recruiters, including YOUNAN, brought into QADIR's medical office.

## IV.   **MEDICARE PROGRAM**

14.   The Medicare Program (Medicare) is a federally-funded health care program providing benefits to persons who are over the age of sixty-five or disabled and was established by Congress in 1965, as Title 18 of the Social Security Act and codified at Title 42, United States Code, Section 1395. The Medicare program is administered through the Centers for Medicare and Medicaid Services (CMS), formerly the Health Care Financing Administration (HCFA). CMS is a division of the Department of Health and Human Services (DHHS) of the United States Government.

15.     Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

16.     Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D).   Medicare Part B helps pay the cost of physician services, laboratory services, durable medical equipment, and supplies, and other health services and supplies not paid by Part A.

17.     Part D of the Medicare program subsidizes the costs of prescription drugs for Medicare beneficiaries in the United States.   It was enacted as part of the Medicare Prescription Drug, Improvement and Modernization Act of 2003 and went into effect on January 1, 2006.   Part D benefits are administered by private insurance plans that are reimbursed by Medicare through CMS.

18.     Beneficiaries can obtain Part D benefits in two different ways: they can join a Prescription Drug Plan which covers only prescription drugs; or they can join a Medicare Advantage Plan that covers both prescription drugs and medical services.

Typically, a Medicare beneficiary enrolled in a Medicare Part D plan would fill their prescription at a pharmacy utilizing their Medicare Part D plan coverage to pay for the prescription.   The pharmacy then submits the prescription claim for

7

reimbursement to the Medicare Part D beneficiary's Part D plan for payment under the beneficiary's Health Insurance Claim Number and/or Medicare Plan Identification Number.

## V.   WITNESS INTERVIEWS

19.   The following witnesses provided information regarding QADIR:

### A.   Confidential Source-1

20.   In February 2014, CS-1 provided information regarding QADIR and YOUNAN. CS-1 knows YOUNAN and knows him to be a patient recruiter for QADIR.   YOUNAN is not a medical professional. CS-1 stated that YOUNAN started bringing patients in to see QADIR approximately two years prior to February 2014.   CS-1 stated that YOUNAN typically brought in two or three patients every Tuesday and Friday to see QADIR for drugs and home care. Originally, YOUNAN brought the patients to QADIR's practice location at 43138 Dequindre Rd., Sterling Heights, Michigan 48314; QADIR moved in or around May 2014, and CS-1 observed YOUNAN bringing patients to QADIR at his new office located in Sterling Heights.

21.   CS-1 worked out of the same office building as QADIR as of his/her initial contact in February 2014. CS-1 observed four patient recruiters (YOUNAN, Recruiter-2, Recruiter-3, and Recruiter-4) bring patients to see QADIR.   CS-1

observed patients state that they did not want the EMG tests or that they did not know why they are getting the tests. CS-1 stated that QADIR did not run queries on his patients on MAPS (the Michigan Automated Prescription System, a prescription monitoring program to identify and prevent drug diversion) to see where they might be getting other controlled substances nor did QADIR have his patients sign any paperwork regarding "doctor shopping." CS-1 stated that QADIR received eight to ten notices from the State of Michigan and DEA requesting that he run MAPS queries on his patients due to "doctor shopping."

22.   CS-1 observed YOUNAN arranging for prescriptions for controlled substances for the beneficiaries YOUNAN recruited to QADIR's practice. CS-1 stated that YOUNAN takes for himself both a copy of any drug prescriptions for the patients and the patient's identification. CS-1 stated that YOUNAN has taken the prescriptions for his patients himself and filled them at local pharmacies. CS-1 stated that YOUNAN claimed to have made $500,000 in the first two months of 2014 from working with the Michigan Department of Human Services (DHS), Disability Determination Services (DDS), Family Independent Agency (FIA), and taking patients into QADIR's office.

23.   CS-1 also stated that YOUNAN offered WITNESS-2 $100 per patient that s/he brought into QADIR's office. CS-1 stated that YOUNAN always has

9

$100 bills and observed YOUNAN pay patients with one or two $100 bills in the parking lot of QADIR's old office location.

24.     CS-1 also provided evidence of YOUNAN and QADIR's involvement in medical testing and home health care fraud as well.  In March 2014, CS-1 provided agents with additional information regarding QADIR's medical practice. That month, CS-1 was present when YOUNAN brought in patients to QADIR's office.  CS-1 identified the patients YOUNAN had brought in to see QADIR on March 14, 2014: L.G., D.E., R.M., B.M., and J.M.

25.     A review of Medicare billing data showed that QADIR billed Medicare for Electromyography (EMG) tests purportedly performed on L.G., D.E., and R.M. on March 14, 2014 for a total of $4,172.11.  According to CS-1, s/he believes that all of YOUNAN's patients get EMGs at QADIR's office, regardless of need.  S/he has seen their EMG results, all of which are normal..

26.     Additionally, according to the Medicare data, all five received prescriptions for home health care services on that date.  CS-1 noted generally that all of YOUNAN's patients walked into QADIR's office unassisted and did not appear to need home care services.  In total, QADIR billed $5,146.29 for services purportedly performed on YOUNAN's five beneficiaries on March 14, 2014.

10

27.    CS-1 stated that Recruiter-2 brought approximately twenty patients per week to see QADIR at his old location.  CS-1 stated that Recruiter-2 paid QADIR $75 to $100 cash per patient that QADIR sees.  Recruiter-2 received copies of the prescriptions for medicine and home health care for his/her patients.

28.    CS-1 stated that s/he overheard a call between Recruiter-3 and an office worker at QADIR's office where Recruiter-3 said s/he offered the patient $250 to see QADIR.

29.    In November 2014, CS-1 provided information to agents regarding a patient complaint at QADIR's office.  CS-1 stated that QADIR's office manager received a phone call from Medicare beneficiary C.W. who called the office to complain about charges on his/her account.  QADIR's office manager flagged the patient file with a green sticker and put a note on it to not see C.W. again.

30.    In May 2015, CS-1 provided information to agents regarding YOUNAN at QADIR's new office in Sterling Heights.  CS-1 observed that YOUNAN appeared to have his own office within QADIR's medical practice with unfettered access to the patient files.  Once, when CS-1 was saying goodbye to YOUNAN in the doorway to his office at the S, CS-1 overheard YOUNAN providing Medicare beneficiary information to an unknown person on the other end.  YOUNAN stated the name, date of birth, and Medicare number of Medicare

11

beneficiary J.K. over the phone. Data analysis confirmed that the Medicare beneficiary information belonged to J.K. and that s/he was a patient at QADIR's office and had been billed in the past for services there. QADIR has certified J.K. for home health services at least 5 times since February 2013.

31.     Later in May 2015, CS-1 provided additional information to agents regarding QADIR's medical practice. CS-1 observed Medical Assistant (MA)-1 provide Medicare beneficiary A.S.'s information over the phone to YOUNAN from the front desk. CS-1 knew it was YOUNAN because MA-1 was next to CS-1 at the time and MA-1 referred to the individual on the phone as YOUNAN, and MA-1 told CS-1 that YOUNAN was on the phone. Data analysis confirmed that QADIR was listed as the referring physician for home health care services billed to Medicare for A.S.     A.S. also had prescriptions for controlled substances, hydrocodone bitartrate-acetaminophen, and other medications written by QADIR and filled at local pharmacies in 2015.

32.     On a recording from May 2015 at QADIR's office, YOUNAN is heard asking about patient files and jokes about bringing a patient file to his house. YOUNAN's office can be seen in the video.

33.    Later in May 2015, on another recording, YOUNAN is heard on a telephone call with an office worker at QADIR's office asking about a specific patient.

**B.    Witness-1**

34.    In December 2014, WITNESS-1 was interviewed by agents regarding his/her knowledge and observations of QADIR's medical practice.  QADIR had previously leased office space inside of another medical practice's building in Sterling Heights. WITNESS-1 was working at a medical practice that shared a suite with QADIR.

35.    During that time, WITNESS-1 observed YOUNAN and another patient recruiter (Recruiter-2) bring in groups of patients to see QADIR at that location.  WITNESS-1 observed the patients waiting to be seen by QADIR in the lobby for five to six hours prior to being seen for medical tests.  WITNESS-1 observed YOUNAN and Recruiter-2 verbally fight over the alleged theft of patients.  WITNESS-1 described the patients that YOUNAN brought to see QADIR as appearing destitute.  In your Affiant's experience, patient recruiters often target indigent individuals and drug-seekers because they are more likely to give up their Medicare beneficiary information for money or controlled substance prescriptions.

13

36.    During this same time period, WITNESS-1 also became aware that QADIR was running EMG tests on his patients.  WITNESS-1 stated that s/he was present at the office when EMG tests were purportedly being done on QADIR's patients, including patients from YOUNAN, and WITNESS-1 did not hear any patient reactions during the tests.  WITNESS-1 stated that s/he had the same test done on her/him and that s/he screamed.   Approximately 72% of QADIR's Medicare beneficiaries received at least one nerve conduction test.

37.    While WITNESS-1 was in the same office suite as QADIR's medical practice, s/he took calls from QADIR's patients who constantly requested drugs. In addition to conducting EMG tests, QADIR also wrote prescriptions for controlled substances, home health care, and physical therapy.  WITNESS-1 never observed any physical therapists or occupational therapists providing services out of QADIR's office but WITNESS-1 believed that QADIR was billing for those services.  The Medicare billing confirms that QADIR billed for physical therapy from his former Sterling Heights location.

38.    WITNESS-1 also observed YOUNAN sell a bag of pills for cash in the parking lot to the medical office.

39.    WITNESS-1 stated that QADIR moved to his new location in Sterling Heights across the parking lot in the spring of 2014.

### C.    Witness-2

40.    In April 2015, WITNESS-2 was interviewed regarding his/her knowledge of QADIR's medical practice in QADIR's former Sterling Heights location. WITNESS-2 used to work as a medical assistant for the doctors who worked at QADIR's former office location.

41.    WITNESS-2 had a number of duties while working at this location: s/he (a) translated for patients; (b) checked patients' vitals including blood pressure, height, weight, and eyes; (c) conducted pulmonary function tests when necessary; (d) prepared patient files for the doctor's evaluation; (e) filled out the face sheets and received schedules from the State of Michigan for patient appointments; and (f) assigned the patients randomly to the doctors depending upon which doctor would be present on any particular day.

42.    WITNESS-2 stated that s/he observed individuals s/he referred to as "friends" of patients bringing them into QADIR's office.  WITNESS-2 also observed QADIR meet privately with the "friends" in the lunchroom area behind a closed door.  YOUNAN was one of the "friends" that WITNESS-2 observed at QADIR's office.  WITNESS-2 also observed the "friends" receive prescriptions for the patients that they brought into QADIR's office. WITNESS-2 observed QADIR and his office manager conducting EMGs or nerve conduction tests.

15

43.     YOUNAN asked WITNESS-2 if s/he knew anyone that was over 60 or eligible for Medicare that s/he could bring into QADIR's office for treatment. YOUNAN offered to pay WITNESS-2 $100 for each patient that s/he could bring into QADIR's office.   WITNESS-2 declined. WITNESS-2 stated that QADIR would reserve whole days to see YOUNAN's patients.   YOUNAN's patients wanted Vicodin, according to WITNESS-2, and WITNESS-2 heard YOUNAN tell QADIR what a particular patient needed, referring to medications.

**D.     Interview with YOUNAN**

44.     On June 17, 2015, YOUNAN was arrested pursuant to a complaint regarding conspiracies to pay or receive kickbacks, in violation of 42 U.S.C. § 1320a–7b(b), and 18 U.S.C. § 371.

45.     YOUNAN stated that he was a patient recruiter for DR. QADIR. YOUNAN said that DR. QADIR would provide him with a list of patients for YOUNAN to recruit.   YOUNAN would then reach out to the patients and arrange for them to get to QADIR's office. As a number of the patients were Arabic speaking, YOUNAN also served as a translator.

46.     YOUNAN said he would pay the patients after the visits, but would sometimes pay the patient in DR. QADIR's office.

16

47.     YOUNAN said DR. QADIR initially paid him $250 or $300 for each patient he brought to DR. QADIR's practice.   DR. QADIR initially paid YOUNAN by check.  Bank records confirm that DR. QADIR paid YOUNAN by check from on or about October 2010 through on or about October 2014, through his companies, Rizwan Qadir MD PC and Neuroscience PC.

48.     YOUNAN said that DR. QADIR later wanted to pay YOUNAN through payroll so that if DR. QADIR was ever investigated, he could explain that YOUNAN was paid for being a driver, translator and marketer for his businesses. Payroll records from Rizwan Qadir MD PC confirm that YOUNAN has received payroll checks since 2012.

49.     YOUNAN also said that DR. QADIR paid other patient recruiters (Recruiter-2, Recruiter-3, Recruiter-4, and Recruiter-5) to bring patients to his office.

50.     YOUNAN also admitted that he was paid by home health agencies for Medicare patients that were certified by DR. QADIR, including Home Health-1, Home Health-2, Home Health-3, Home Health-4, and Home Health-5.   Bank records confirm that YOUNAN was paid $76,000 by Home Health-1, $12,000 Home Health-2 and $5,200 FROM Home Health- 3 by check.

17

**E.     Medicare Beneficiary Interview**

51.     In May 2015, agents interviewed Medicare beneficiary C.W. who had previously called QADIR's office in November 2014 to complain about charges. C.W. told agents that s/he had in fact been to see a doctor one time in Sterling Heights in 2014.  C.W. stated that s/he had been solicited to see the doctor by someone who lived in the same building as C.W.  C.W. stated that s/he had been offered $200 to see the doctor and had no other reason to see him/her.  C.W. stated that at the time, s/he actually had a nerve problem with his/her left arm but the doctor did a nerve test on both of his/her legs instead.  C.W. stated that s/he called the office to complain about the charges to his/her Medicare because s/he never received the promised $200 from the patient recruiter after s/he saw the doctor. This information corroborates the information provided by CS-1.

## VI.   BANK RECORDS ANALYSIS

52.     An analysis of DR. QADIR's bank records, including records for two companies that he owns – Rizwan Qadir MD PC and Neuroscience PC – and payroll records from Rizwan Qadir MD PC and Fordson Medical Group PC show the following:

53.     In addition to the payroll checks, DR. QADIR paid YOUNAN $76,800 in 50 checks beginning in October 2010. DR. QADIR signs the checks.

18

Almost all the checks are for multiples of $250 or $300. This confirms YOUNAN's statements that he was paid $250 to $300 per patient.

54.   JOHNNY YOUNAN also received checks from 13 home health agencies, totaling more than $220,000, from 2010 to 2013.

55.   YOUNAN also deposited over $75,000 in cash to his accounts between 2010 and 2013.

56.   These accounts also show checks from DR. QADIR and his companies to Recruiter-2. These amounts are also multiples of $100, with a few multiples of $50.

## VII.   MAPS DATA ANALYSIS

57.   Among neurologists in Michigan QADIR has the third most controlled substance patients (393 patients). He also caters to the drug seeking population more than any other neurologist in the State – of those 393 controlled substance patients, 101 are drug seekers, meaning that they are in the 99.5th percentile in terms of the number of separate physician practices they are seeing to get narcotics in a two year period.

58.   MAPS reports are used to identify all controlled substance prescriptions dispensed by pharmacies and practitioners in the State of Michigan. The MAPS chart below lists the total number of units dispensed for prescriptions

19

written by QADIR from January 1, 2010 to May 27, 2015, broken down by DEA drug schedule.

59.     As discussed above, your Affiant has received information from several sources that QADIR worked closely with YOUNAN, who brought drug seeking patients to QADIR, and that most of these drug seeking patients were Medicare beneficiaries.

| | DEA SCHEDULE | | | | |
|---|---|---|---|---|---|
| **Filled Dates** | **2** | **3** | **4** | **5** | **Total** |
| **2010** | 76,388 | 9,462 | 9,627 | 13,056 | 108,533 |
| **2011** | 126,541 | 14,908 | 15,394 | 18,282 | 175,125 |
| **2012** | 146,083 | 13,173 | 47,552 | 64,354 | 271,162 |
| **2013** | 156,915 | 7,681 | 47,259 | 111,238 | 323,093 |
| **2014** | 153,850 | 9,990 | 55,521 | 75,024 | 294,385 |
| **2015** | 70,066 | 4,244 | 26,026 | 23,096 | 123,432 |
| **Grand Total** | 729,843 | 59,458 | 201,379 | 305,050 | 1,295,730 |

## VIII.  MEDICARE DATA ANALYSIS

60.     Analysis of Medicare Part B data reveals that from January 1, 2010, through April 23, 2015, QADIR, utilizing NPI 1427136043, billed Medicare Part B approximately $14,130,404.91 all of which is attributed to services purportedly rendered by QADIR.   For these claims, Medicare Part B paid approximately $2,935,796.94.   The top procedure codes billed by QADIR to Medicare Part B include CPT codes 95904 and 95903, nerve conduction studies, and CPT code

20

99214, upper level office visits, for a total of approximately 55% of QADIR billings to Medicare. The following chart breaks down the claims submitted to Medicare by year by QADIR and the corresponding approximate billed and paid amounts.

61. In addition, Medicare Part A has paid approximately $5,017,140 for home health care services referred by QADIR.

## A.   Billing for Dead Beneficiaries

62. QADIR, through Rizwan Qadir MD PC, billed Medicare for services provided to beneficiaries who were already deceased at the time the purported services were rendered between approximately December 2009 and July 2014. Analysis of Medicare Part B data reveals that QADIR submitted eight claims for three Medicare beneficiaries' service dates that occurred after the beneficiaries' deaths from Rizwan Qadir MD PC for a total of $5,721 for services supposedly performed after the patients' death. Those claims included claims for patient visits, recertification of home health care services, nerve conduction studies and other testing.

## IX.    CONCLUSION

63.    Based on your affiant's training and experience and the facts

presented herein, your affiant respectfully submits there is probable cause to

believe that DR. QADIR violated 18 U.S.C. § 1347, 18 U.S.C. § 1349, 18 U.S.C. §

371 and 42 U.S.C. § 1320a–7b(b). As such, your affiant respectfully requests that

an arrest warrant be issued for DR. QADIR.

_____

Justin Bidwell, HHS-OIG

Sworn to and subscribed before me on this _17_ th day of June 2015.

_____
HONORABLE DAVID R. GRAND
United States Magistrate Judge
Eastern District of Michigan

22